## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| FLOORS USA INC.,<br>on behalf of itself and all others similarly<br> situated,<br>                    Plaintiff,<br>   v.<br><br>HICKORY SPRINGS<br>MANUFACTURING COMPANY,<br>VALLE FOAM INDUSTRIES, INC.,<br>DOMFOAM INTERNATIONAL, INC.,<br>THE CARPENTER COMPANY,<br>THE WOODBRIDGE GROUP,<br>FLEXIBLE FOAM PRODUCTS, INC.,<br>SCOTTDEL, INC.,<br>FOAMEX INNOVATIONS, INC.,<br>FUTURE FOAM, INC.,<br>VITAFOAM PRODUCTS CANADA<br>LIMITED, VITAFOAM, INC.,<br><br>                  Defendants. | CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br><br>Case No. _____ |

Plaintiff Floors USA Inc., ("Floors USA") individually and on behalf of a class of all

those similarly situated, brings this action to recover damages and to obtain injunctive relief for

price fixing under Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. §1, and the antitrust

laws of the United States against Defendants Hickory Springs Manufacturing Company, Valle

Foam Industries, Inc., Domfoam International, Inc., The Carpenter Company, The Woodbridge

Group, Flexible Foam Products, Inc., Scottdel, Inc., Foamex Innovations, Inc., Future Foam,

Inc., Vitafoam Products Canada Limited, and Vitafoam Inc., which are or were operating in the

market known as polyurethane foam in the United States between at least 1999 and the present.

Plaintiff Floors USA demands a trial by jury and alleges the following on information and belief:

## I.    NATURE OF THE ACTION

1.      This case arises out of a conspiracy among Defendants and their co-conspirators with the purpose and effect of fixing prices of polyurethane foam and polyurethane foam products ("polyurethane foam").  During the Class Period, and earlier, Defendants contracted, combined or conspired to fix, raise, maintain and/or stabilize prices and allocate customers for polyurethane foam in the United States, the purpose and effect of which is to maintain supracompetitive prices, by the means and mechanisms described herein.  As set forth below, the conspiracy is reflected in specific and detailed communications between and among executives and employees of Defendants and their co-conspirators who have communicated with one another to fix prices and allocate customers.

2.      This case is brought as a class action on behalf of all persons who purchased polyurethane foam directly from one or more of the Defendants or their co-conspirators, from at least as early as 1999 to the present (hereinafter, the "Class Period"), exclusive of Defendants and their co-conspirators.

3.      As alleged herein, Defendants explicitly agreed with each other to charge inflated prices for polyurethane foam.  Every price increase known during the Class Period was the result of conspiratorial and anti-competitive discussions among Defendants to fix prices.  Defendants also engaged in a combination and conspiracy among themselves to allocate customers in specific communications between each other.

4.      As a direct and proximate result of the unlawful conduct and price-fixing conspiracy of Defendants and their co-conspirators, as alleged in this Complaint, Plaintiff and the other members of the Class (defined below) have paid more during the Class Period for

polyurethane foam than they otherwise would have paid in a competitive market and therefore, have been injured in their respective businesses and property.

5.      Plaintiff has been a direct purchaser of polyurethane foam from one or more of the Defendants during the Class Period.  Plaintiff brings this lawsuit as a class action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees, to enjoin Defendants' anticompetitive conduct, and for such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## II.      JURISDICTION AND VENUE

6.      Plaintiff brings this action to obtain injunctive relief and to recover damages arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

7.      Jurisdiction is conferred upon this District pursuant to 15 U.S.C. §§ 15 and 26, and U.S.C. §§ 1331 and 1337.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 15, 22 and 26 and pursuant to 28 U.S.C. § 1391(b), (c) and (d), because at all times relevant to the Complaint, Defendants transacted business, were found, or acted through subsidiaries or agents present in this District.  Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this District.  The acts complained of have had, and will have, substantial anti-competitive effects within this District.

9.      This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia*, each of the Defendants: (a) committed acts in furtherance of the conspiracy alleged herein in this District and directed the unlawful conspiracy through persons and entities located in this District, including fixing the prices of polyurethane foam sold to purchasers in this

District; (b) transacted business in polyurethane foam and other products in this District; (c) maintains and has maintained continuous and systemic contacts with this District over a period of years; and (d) purposefully availed itself of the benefits of doing business in this District. Accordingly, each of the Defendants maintains minimum contacts with this District more than sufficient to subject it to service of process and sufficient to comply with due process of law.

### III.    PARTIES

#### A.    Plaintiff

10.    Plaintiff Floors USA Inc. is a Pennsylvania corporation that has been servicing the Delaware Valley area for over 33 years.  Floors USA sells and installs a wide variety of flooring including hardwood flooring, carpeting, area rugs, tile, stone, laminate, and vinyl. Floors USA has two store locations: the first located at 555 South Henderson Road, King of Prussia, Pennsylvania 19406, and a second location at 2005 East Route 70, Cherry Hill, New Jersey 08003.   During the Class Period, Floors USA purchased polyurethane foam directly from one or more of the Defendants and suffered injury as a result of Defendants' unlawful conduct.

11.    The prices Floors USA paid to Defendants for polyurethane foam were greater than the prices it would have paid in the absence of Defendants' unlawful conduct alleged herein. Floors USA has therefore been injured in its business and property by reason of Defendants' antitrust violations.  Floors USA brings this lawsuit as a class action on behalf of itself and all direct purchasers who, during the Class Period, purchased polyurethane foam from one or more of the Defendants and suffered injury as a result.

#### B.    Defendants

12.    Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a North Carolina corporation with its headquarters located at 235 2nd Avenue, NW, Hickory,

4

North Carolina 28601.  During the Class Period, Hickory Springs directly sold polyurethane foam throughout the United States.

13.     According to its website, Hickory Springs is "one of the nation's largest integrated components manufacturers and suppliers for the furniture and bedding industries with more than 60 operating facilities in the United States and throughout the world.  The furniture industry is the largest segment of Hickory Springs' customer base.  With more than 160 flexible polyurethane foam formulations, Hickory Springs is one of the United States' largest producers of foam."[1]

14.     Defendant Valle Foam Industries, Inc. ("Valle") is a privately owned and operated corporation with its headquarters located at 4 West Dr., Brampton, Ontario L6T 2H7, Canada.  During the Class Period, Valle, directly and/or through its control of its affiliates, sold polyurethane foam throughout the United States.

15.     According to a press release from the Ontario BioAuto Council, Valle "manufactures slab stock polyurethane foams for the furniture, bedding, packaging, carpet and children's toy industries."[2]

16.     Defendant Domfoam International, Inc. ("Domfoam") is a subsidiary of Valle Foam Industries, with its headquarters located at 8785 Langelier Blvd., Montreal, Quebec, H1P 2C, Canada.  During the Class Period, Domfoam sold polyurethane foam throughout the United States.

17.     According to its website, "Domfoam is a manufacturer/wholesaler of Sponge & Polyurethane Foam.  It was established in Montreal, Quebec, Canada.  Since its incorporation in 1963, Domfoam has grown to be Canada's leading and most diversified manufacturer of ether,

---

[1] http://www.hickorysprings.com/2008/History.html
[2] http://www.bioautocouncil.com/investments.aspx

ester, rebounded flexible polyurethane foams and visco elastic foam.  In its 260,000 square-foot

Montreal plant, Domfoam services the demanding urethane market in Canada and in the USA by

meeting the toughest industry standards and requirements."  Domfoam provides foam to and

professionally services the following fields, according to its website:  "mattresses, sponge foam

blocks, carpet cushion, pillows, bolsters, convolute, furniture foam, toppers, antistatic foam, anti-

microbial foam, visco-elastic foam, camping foam, and sporting goods."[3]

18.    Defendant The Carpenter Company ("Carpenter") is a privately owned and

operated company with its headquarters located at 5016 Monument Avenue, Richmond, Virginia

23230.  During the Class Period, Carpenter directly sold polyurethane foam throughout the

United States.

19.    According to its website, "Carpenter Co. is the largest manufacturer of

polyurethane foam cushioning in the world."  It offers the following products:  air filter media,

bedding, carpet cushion, chemicals, chemical systems, consumer products, expanded polystyrene

systems, flexible foam packaging furniture, molded manufacturing, polyester fiber, and tire

products.[4]

20.    Defendant The Woodbridge Group ("Woodbridge") is a Canadian corporation

with its headquarters located at 4240 Sherwoodtowne Blvd., Mississauga, Ontario, L4Z 2G6,

Canada.  During the Class Period, Woodbridge directly sold polyurethane foam throughout the

United States.

21.    According to its website, Woodbridge is well known for automotive solutions but

also "supplies a growing list of diverse sectors including: Commercial and Recreational

---

[3] http://www.domfoam.com/WEB%20domfoam%20avec%20a-z/company-head.htm
[4] http://www.carpenter.com/

Transportation, Building Products, Construction, Packaging and several consumer and industrial markets."[5]

22.     Defendant Flexible Foam Products, Inc. ("Flexible Foam") is a privately owned and operated Ohio company with its headquarters located at 12575 Bailey Road, Spencerville, Ohio 45887 and operations in Texas, Indiana, Florida and Wisconsin.  It is a subsidiary of Ohio Decorative Products, Inc., also of Spencerville, Ohio.  During the Class Period, Flexible Foam directly sold polyurethane foam throughout the United States.

23.     According to its website, Flexible Foam "manufactures polyurethane foam and rebond products," "serving customers in the bedding, flooring, furniture, packaging, and automotive industries for over 50 years."[6]

24.     Defendant Scottdel, Inc. ("Scottdel") is a privately held corporation with its headquarters located at 400 Church Street, Swanton, Ohio 43558.  During the Class Period, Scottdel directly sold polyurethane foam throughout the United States.

25.     According to its website, "Scottdel began manufacturing bonded urethane carpet cushion in 1961," and the company "manufactures a complete line of commercial and residential bonded urethane cushions ranging in density from 3.5 pounds to 10 pounds per cubic foot."[7]

26.     Defendant Foamex Innovations, Inc., formerly known as Foamex International, Inc. ("Foamex"), is a privately owned and operated company with its headquarters located at Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, Pennsylvania 19063.  During the Class Period, Foamex sold polyurethane foam throughout the United States.

27.     According to its website, Foamex is a leading producer for the "Home, Healthcare, Electronics, Industrial, Personal Care and Transportation Markets."  Its products

---

[5] http://www.woodbridgegroup.com/aboutus/aboutus_capa.html
[6] http://flexiblefoam.com/About/CompanyOverview.aspx
[7] http://www.scottdel.com/html/about.html

include "finished goods, sub-assemblies, services and raw materials for OEMs, fabricators and retailers."  Its foam is used by the automotive, shipping, furniture, and electronics industries as well as "critical components for filters, dispensers, gaskets and seals" in a variety of products.[8]

28.     Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated company with its headquarters located at 1610 Avenue N, Council Bluffs, Iowa 51501.  During the Class Period, Foamex sold polyurethane foam throughout the United States.

29.     According to its website, Future Foam produces foam products and services for bedding, foam blocks, carpet cushion, furniture, and packaging.[9]

30.     Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its headquarters located at 150 Toro Road, North York, Ontario M3J 2A9, Canada.  During the Class Period, Vitafoam Canada sold polyurethane foam, either directly or through its affiliates, throughout the United States.

31.     According to its website, Vitafoam Canada "manufactures all types of flexible polyurethane foam for use in furniture, bedding and automotive applications, including packaging, medical, industrial and a full range of memory foams . . . [and] latex mattresses and toppers."[10]

32.     Defendant Vitafoam, Inc. is a privately owned and operated company with its headquarters located a 2215 Shore Drive, High Point, North Carolina 27263.  During the Class Period, Vitafoam, Inc. sold polyurethane foam, either directly or through its affiliates, throughout the United States.  Collectively, Vitafoam Canada and Vitafoam, Inc. are referred to as Vitafoam.

---

[8] http://www.fxi.com/html/01_company.php
[9] http://futurefoam.com/products.asp
[10] http://www.vitafoam.ca/

33.     According to its company profile on LinkedIn.com, "Vitafoam, Inc. manufactures plastic netting, automotive products, general trade, and nonwoven products.  It produces mattresses and pads, convoluted pads, wheelchair components, and protective packaging for medical supplies, as well as positioning and support wedges, and immobilizing devices, such as neck bracing pillows for the home and commercial healthcare industries.  The company offers polyurethane foam products for packaging, furniture, and upholstery industries; marine industry products, such as fenders, drainable boat seats, waterproof cushions, air circulation pads, and filtration devices; and foam for fabric producers, laminators, trim companies, and original equipment manufacturers in the automotive industry.  It also provides laminating materials, such as fabrics, flexible polyurethane foam, nonwoven webs, films, and other substrates, as well as carpet underlay for residential and commercial sectors.  Vitafoam, Inc. also serves medical, marine, technical, bedding, lamination, and carpet underlay industries."[11]

## IV.    AGENTS AND CO-CONSPIRATORS

34.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

35.     Various persons and/or firms not named as defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

36.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

---

[11] http://www.linkedin.com/companies/vitafoam

## V.      FACTUAL ALLEGATIONS

**A.      The Polyurethane Foam Market**

37.      Polyurethane foams are used for cushioning and insulation.  Common applications include pillows, mattresses, furniture cushions, automotive seat cushions, packaging, cosmetic applicators, carpet cushioning, sound control, building insulation, footwear, surfboards, and filtration media, among other uses.

38.      Polyurethane foam refers to different types of foam consisting of polymers made of molecular chains bound together by urethane links.  It can be flexible or rigid, but generally has a low density.

39.      According to *Chemical & Engineering News*, flexible polyurethane foam is found in sofas and mattresses, while rigid polyurethane foams are used for building insulation and to repair cracks in buildings.  Though Flexible and rigid foams make up most of the polyurethane foam market, there are two other types with more specialized uses:  "microcellular foam, which may be used to make car steering wheels or line the insides of athletic helmets, and elastomeric foam, which is typically used to make the outer sole of many types of footwear, including athletic shoes."[12]

40.      "The four classes of polyurethane foam, all with different physical properties, are created by varying a basic addition polymerization reaction involving a diol or polyol, a diisocyanate, and water."[13]

41.      "The diisocyanate reacts with the diol or polyol to create the urethane polymer.  Water reacts with some of the isocyanate groups to produce carbon dioxide gas, and the bubbles

---

[12] Linda Wang, Polyurethane Foam, *Chemical & Engineering News*, 84:2, 48 (Jan. 9, 2006).
[13] *Ibid.*

get trapped in the viscous liquid as it polymerizes, expands, and solidifies. . . .  On a large scale, catalysts and surfactants can be added to boost the reactions and control the foaming process.  A wide range of other additives, including stabilizers, dyes, fire retardants, and fungicides, may be added to meet specific performance demands.  Auxiliary blowing agents, such as hydrofluorocarbons, liquid carbon dioxide, and acetone, are also typically used to prepare the foam.  Ultimately, the kinds and amounts of raw materials used in the manufacturing process help determine how the final product performs."[14]

42.     According to the Polyurethane Foam Association ("PFA"), "To manufacture foam for cushioning, two basic procedures are used.  In one, the chemical mix is poured onto a moving conveyor, where it is allowed to react and expand.  Sides on the conveyor allow the foam to rise into a 'bun' or slab anywhere from two to four feet high.  The continuous slab is then cut, stored, and allowed to cure for up to 24 hours.  This manufacturing procedure is the *slabstock* production process.  The cured foam is subsequently fabricated into useful shapes.  Most foams for use in furniture and bedding are produced this way."[15]

43.     "A second method, *foam molding*, is a process where individual items are produced by pouring foam chemicals into specially shaped molds and allowing the foam reaction to take place.  This process is used primarily for automotive cushioning, although some contract furniture utilizes molded cushions."[16]

44.     "Flexible foams have mainly open cells, formed by gas bubbles that have popped.  Air can pass through the foam easily, resulting in a soft, resilient, flexible material.  In rigid foams, most of the cells stay closed.  The material is thus harder and less resilient.  Controlling

---

[14] *Ibid.*
[15] Polyurethane Foam Association, <u>Flexible Polyurethane Foam: a Primer</u>, *In Touch*, February 1991, http://www.pfa.org/intouch/new_pdf/lr_IntouchV1.1.pdf
[16] *Ibid.*

the proportion of open cells to closed cells during the production process is one of the ways that the properties of foam can be manipulated, adding to the material's versatility."[17]

45.     According to the PFA, flexible polyurethane foam ("FPF") "is widely used for its qualities: it is light weight, resilient, quiet, low odor and resistant to mildew and other triggers of common allergies.  FPF may also be molded and cut. . . .  More than 1.2 billion pounds of foam are produced and used every year in the U.S."[18]

46.     Rigid polyurethane foam is commonly used in construction.  According to the Center for Polyurethanes Industry, it "has unique insulating properties that make it ideal for walls and roofs" because of its "remarkably strong, yet lightweight, low-density structure that is both dimensionally stable and moisture-resistant with low vapor transmission."  It is commonly used for insulation, and when sprayed, it "provides weatherproof sealants, forms a seamless layer of insulation, and fills gaps and seams during application and covers irregular, hard-to-insulate shapes."[19]

47.     In 2010, domestic revenue for the polyurethane foam industry is expected to be approximately $12 billion.

**B.     Market Factors Support the Existence of the Conspiracy**

48.     Various market factors make the polyurethane foam market susceptible to anticompetitive practices and unlawful collusion.

**C.     Significant Barriers to Entry**

49.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-

---

[17] Linda Wang, Polyurethane Foam, *Chemical & Engineering News*, 84:2, 48 (Jan. 9, 2006).
[18] Polyurethane Foam Association, Flexible Polyurethane Foam: Industry at a Glance, http://www.pfa.org/Library/IAG_no_logo.pdf
[19] Center for the Polyurethanes Industry -  Building & Construction, http://www.polyurethane.org/s_api/sec.asp?CID=913&DID=3626

competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

50.     There are significant barriers to entry in the polyurethane foam market.  Entry requires, among other things, that a company incur significant start-up capital expenditures, including those needed for manufacturing facilities, and significant investment in a distribution network.

51.     Existing manufacturers have established relationships with upstream suppliers and downstream purchasers, and can negotiate lower prices for raw materials and term contracts with major customers.  Without these contacts, new entrants would face significant hurdles to afford inputs and secure customers.

52.     The industry has been consolidating rather than attracting new entrants.  Major players within this industry have been active in acquiring smaller companies and other competitors over the course of the last ten years. For example:

        a.      In 2007, Defendant Carpenter acquired its European competitor Dumo NV.

        b.      In 2006, following the purchase of its parent corporation, Vitafoam, Inc. sold one of its plants to Olympic Products LLC, a joint venture between Woodbridge and Hickory Springs, and another plant to Flexible Foam Products.[20]

## D.      Inelastic Demand Due to Lack of Substitutes

53.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In

_____

[20] Michelle Rash, <u>Buyout Leads Foam Firm to Sell Two Triad Plants</u>, *The Business Journal*, Feb. 17, 2006, http://www.bizjournals.com/triad/stories/2006/02/20/story8.html

other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

54.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.

55.     Demand for polyurethane foam is relatively inelastic.  According to the PFA, "In furniture and bedding applications, short staple polyester fiber is often used instead of [flexible polyurethane foam], as is cotton, but both alternative materials have poor height recovery characteristics after compression.  Steel springs also recover well but must be insulated from the user with some type of cushioning material.  Comparing [flexible polyurethane foam] to alternative materials in the areas of economics, comfort potential, ease of use, and durability, there is not an acceptable substitute."[21]

56.     Defendants alleged here to be participants in the conspiracy represent a significant portion of the United States polyurethane foam market.  Because of the prohibitive freight costs associated with transporting the low-cost, bulky material, imports from outside North America represent a negligible portion of the market.

**E.      Standardized Product with High Degree of Interchangeability**

57.     The PFA recognizes polyurethane foam as a commodity, which is interchangeable across manufacturers.

58.     When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to unlawfully agree on the price for the product in

---

[21] http://www.pfa.org/faq.html

question, and it is easier to effectively monitor agreed-upon prices.  This makes it easier to form and sustain an unlawful cartel.

**F.    Opportunities to Conspire**

59.    Defendants are members of trade associations, including the PFA, International Sleep Products Association, and others.

60.    Approximately 70% of U.S. polyurethane foam manufacturers are PFA members.

61.    As discussed below, during trade association meetings – including PFA meetings – Defendants seized opportunities to meet in person to allocate customers and coordinate price increases.

**G.    Defendant Vitafoam's Admission of a Conspiracy**

62.    Upon information and belief, in February 2010, Vitafoam voluntarily approached the U.S. Department of Justice, Antitrust Division, to self-report evidence of illegal antitrust activities amongst itself and other companies and individuals in the industry ("competitors") and to seek acceptance into the Antitrust Division's Corporate Leniency Program.  Since that time, Vitafoam and its employees have been cooperating with this investigation.

63.    Upon information and belief, as a result of its application, Vitafoam has received a conditional leniency letter from the DOJ's Antitrust Division.  Under the DOJ Antitrust Division's Corporate Leniency Policy ("DOJ Corporate Leniency Policy"), an applicant for leniency "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter."  Further, "A company that argues that an agreement to fix prices, rig bids, restrict capacity, or allocate markets might be inferred from its conduct but that cannot produce any employees who will admit that the company entered into such an agreement generally has not made a sufficient admission of criminal antitrust violation to

15

be eligible for leniency.  A company that, for whatever reason, is not able or willing to admit to

its participation in a criminal antitrust conspiracy is not eligible for leniency."[22]

**H.      The Conspiracy to Fix Prices and Allocate Customers**

64.      Upon information and belief, an understanding and agreement existed among the

competitors in the foam industry to collectively support price increases.

65.      Upon information and belief, Defendants also agreed to avoid each other's

customers and not attempt to take business or market share from one another.

66.      Upon information and belief, the participants in this conspiracy took numerous

steps to avoid detection of their conspiracy.

67.      Upon information and belief, Defendants also undertook efforts to police the

conspiracy.

**I.      Trade Associations and Business Organizations**

68.      Various industry trade organizations or events facilitated Defendants' illegal

conduct.  Representatives of Defendants have regularly met through such organizations as the

PFA, the International Sleep Products Association ("IPSA"), and Surfaces, a trade group which

includes polyurethane carpet underlay producers.

69.      Representatives of Defendants reached agreements at these industry meetings

held in the United States and abroad.

70.      Representatives of Defendants disguised their attendance at these events as

information gathering and merely used them as an opportunity to fix prices and divvy up their

customers in person.

---

[22] Department of Justice, Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (Nov. 19, 2008), http://www.usdoj.gov/atr/public/criminal/239583.pdf

71.     Representatives of Defendants not only had no intention of learning about the market at these meetings, they essentially controlled the market, and attended these meetings to further demonstrate their control.

**J.     Government Investigation**

72.     On or about July 27, 2010, it was publicly disclosed that the FBI, as part of a multi-jurisdictional investigation of polyurethane foam manufacturers, raided the offices of Carpenter and its competitors, seized documents and forced certain Carpenter offices to close.

73.     Carpenter confirmed the investigation, saying: "In connection with a multi-jurisdiction investigation of the pricing practices to [sic] polyurethane foam products, the U.S. government has required that manufacturers of polyurethane foam, including Carpenter Co., produce information and documents.  Carpenter Co. is being fully responsive and cooperative with the government to facilitate their review."

74.     On or about that same day, the European Commission ("EC") raided the offices of several polyurethane foam manufacturers.  Carpenter was one of the targets of the EC raids as well.

75.     To obtain search warrants, as it appears that it did here against Defendant Carpenter and other Defendants, the United States must demonstrate to a Magistrate Judge probable cause, recounted in a sworn affidavit or testimony grounded on reasonably trustworthy information, that it would obtain evidence of an antitrust violation as a result of executing the search warrant.  That is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations.

76.     The FBI and EC raids lend further support to the allegations of anticompetitive conduct in the market for polyurethane foam.

17

## VI.    ACCRUAL OF CLAIM, CONTINUING VIOLATION,
##    EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

77.    Plaintiff did not discover and could not discover through the exercise of reasonable diligence the existence of the conspiracy alleged herein prior to disclosure of the raids by government agencies of Defendants' facilities.

78.    Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiff and Class members.  These violations constitute injurious acts which restart the applicable statute of limitations

79.    In addition, Defendants' and their co-conspirators' agreement, understanding and conspiracy in violation of the antitrust laws was kept secret.  As a result, Plaintiff and the Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for polyurethane foam throughout the United States throughout the Class Period.  Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

80.    Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

81.    Neither Defendants nor their co-conspirators told Plaintiff or other Class members that they were fixing prices and allocating customers, or engaging in the other unlawful collusive practices alleged herein.  By its very nature, Defendants' and their co-conspirators' conspiracy was inherently self-concealing.

82.     Defendants and their co-conspirators engaged in a successful price-fixing and customer allocation conspiracy, which they affirmatively concealed:

a.     by meeting secretly (including use of private telephonic communications) to discuss prices, customers, and markets of polyurethane foam sold in the United States and elsewhere;

b.     by agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;

c.     by holding secret meetings outside and separate from the formal trade association meetings Defendants were publicly attending; and

d.     by disguising price-fixing meetings and communications as technical and operational meetings.

## VII.    ANTITRUST INJURY

83.     The unlawful contract, combination and/or conspiracy alleged above had and is having, *inter alia*, the following effects:

a.     Prices charged by Defendants and their co-conspirators to Plaintiff and the members of Class for polyurethane foam products were maintained at artificially high and supracompetitive levels;

b.     Plaintiff and members of the Class were required to pay more for polyurethane foam than they would have paid in a competitive marketplace unfettered by Defendants' and their co-conspirators' collusive and unlawful price-fixing; and

c.     Plaintiff and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for polyurethane foam.

84.     During and throughout the period of the contract, combination or conspiracy alleged above, Plaintiff and members of the Class directly purchased polyurethane foam in the United States.

85.     Plaintiff and the other Class members paid more for the polyurethane foam than they would have paid under conditions of free and open competition.

86.     As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, Plaintiff and the members of the Class were injured and financially damaged in their businesses and property, in amounts that are not presently determined.

87.     This is antitrust injury of the type that the federal laws were meant to punish and prevent.

## VIII.   CLASS ACTION ALLEGATIONS

88.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

89.     Plaintiff brings this action on its own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2), on behalf of the following Class:

> All persons or entities which purchased polyurethane foam directly from Defendants or their unnamed co-conspirators from January 1, 1999 to the present.  Excluded from the Class are governmental entities, Defendants, their co-conspirators and their representatives, parents, subsidiaries and affiliates.

90.     The precise number of Class members is unknown to Plaintiff.  However, due to the nature of the trade and commerce involved, Plaintiff is informed and believes, and thereon alleges, that the Class numbers in the thousands.

91.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

92.     Class members are identifiable from information and records in the possession of Defendants.

93.     There are questions of law and fact common to the Class.  These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injury sustained as a result thereof.  The questions include, but are not limited to:

a.      Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize the price charged for polyurethane foam sold in the United States;

b.      The identity of participants in the conspiracy;

c.      The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in the furtherance of the conspiracy;

d.      Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of Plaintiff and other members of the Class;

f.      The appropriate nature of class-wide equitable relief;

g.      The effect of Defendants' conspiracy on the prices of polyurethane foam in the United States during the Class Period; and

h.      The appropriate measure of damages sustained by Plaintiff and other members of the Class.

94.     Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of other members of the Class, and Plaintiff will fairly and adequately protect the interests of the

members of the Class.  Plaintiff bought polyurethane foam directly from one or more

Defendants.  Plaintiff's interests are aligned with, and not antagonistic to, those of the other

members of the Class.  In addition, Plaintiff is represented by competent counsel experienced in

the prosecution of class action antitrust litigation.

95.     The prosecution of separate actions by individual members of the Class would

create a risk of inconsistent or varying adjudications, establishing incompatible standards of

conduct for Defendants.

96.     The questions of law and fact common to the members of the Class predominate

over any questions affecting only individual members, including legal and factual issues relating

to liability and damages.

97.     Class action treatment is a superior method for the fair and efficient adjudication

of this controversy because:

a.      It will avoid a multiplicity of suits and consequent burden on the courts

and Defendants;

b.      It would be virtually impossible for all members of the Class to intervene

as parties-plaintiff in this action;

c.      It will allow numerous individuals with claims too small to adjudicate on

an individual basis because of the prohibitive cost of this litigation, to obtain redress for their

economic injuries;

d.      The prosecution of separate actions by individual Class members would

create the risk of inconsistent or varying adjudications, establishing incompatible standards of

conduct for Defendants; and

      e.      It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

98.    This class action presents no difficulties of management that would preclude its maintenance as a class action.

## IX.    INTERSTATE TRADE AND COMMERCE

99.    The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of the United States, in that, *inter alia*:

      a.      Defendants and their co-conspirators have sold polyurethane foam throughout the United States;

      b.      Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell polyurethane foam throughout the United States;

      c.      In furtherance of the conspiracy alleged herein, Defendants have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and

      d.      The conspiracy alleged herein has affected billions of dollars of commerce.  Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by Plaintiff and other entities who are themselves engaged in commerce.

## X.    CLAIM FOR RELIEF

### For Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act

100.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

101.    Beginning at a time presently unknown to Plaintiff, but at least as early as 1999 and continuing through the present, Defendants and their co-conspirators entered into a

continuing agreement, understanding, and conspiracy in restraint of trade in violations of Section

1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

102.    In furtherance of the unlawful conspiracy, each of the Defendants and their co-

conspirators has committed overt acts, including, *inter alia*:

      a.    agreeing to charge prices at certain levels and otherwise to fix, increase,

maintain and/or stabilize prices of polyurethane foam sold in the United States;

      b.    participating in meetings, conversations, and communications with co-

conspirators regarding prices to be charged for polyurethane foam;

      c.    agreeing to allocate customers;

      d.    meeting with co-conspirators in order to keep the existence of the

conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

      e.    refraining from competing by refusing to offer polyurethane foam at prices

below the agreed-upon fixed price.

103.    The combination and conspiracy alleged herein has had the following effects,

among others:

      a.    Price competition in the sale of polyurethane foam has been restrained,

suppressed, and/or eliminated;

      b.    Prices for polyurethane foam sold by Defendants and their co-conspirators

have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

      c.    Those who purchased polyurethane foam directly or indirectly from

Defendants and their co-conspirators have been deprived of the benefits of free and open

competition.

104.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of polyurethane foam.

105.     As a direct and proximate result of Defendants' illegal agreement, contract, combination trust and/or conspiracy, Plaintiff and the members of the Class have been injured and damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

106.     The conduct of Defendants and their co-conspirators constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## XI.     PETITION FOR RELIEF

WHEREFORE, Plaintiff petitions that:

A. The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed class representative and that Plaintiff's counsel be appointed as counsel for the Class.

B. The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including that the agreement, contract, combination, or conspiracy and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs of the action, including reasonable attorneys' fees, pre and post-judgment interest.

C. Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action as alleged herein.

D. The Court award Plaintiff and members of the Class such other, further and different relief as may be necessary and appropriate.

## JURY DEMAND

107.    Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury trial of all claims asserted in this Complaint so triable.

Dated: September 21, 2010                          Respectfully submitted,

                                                   ZOLL, KRANZ AND BORGESS, LLC,

                                                   By:  /s/ David Zoll                        

                                                   David W. Zoll (0008548)
                                                   6620 W. Central Avenue, Suite 100
                                                   Toledo, Ohio 43617
                                                   Tel.:  419-841-9623
                                                   Fax:  419-841-9719
                                                   Email: david@toledolaw.com

                                                   Theodore J. Leopold
                                                   LEOPOLD KUVIN, P.A.
                                                   2925 PGA Boulevard, Suite 200
                                                   Palm Beach Gardens, Florida 33410
                                                   Tel.:  561-935-4801
                                                   Fax:  561-515-1401

                                                   Stanley D. Bernstein
                                                   Ronald J. Aranoff
                                                   Tania T. Taveras
                                                   BERNSTEIN LIEBHARD LLP
                                                   10 East 40th Street, 22nd Floor
                                                   New York, New York 10016
                                                   Tel.:  212-779-1414
                                                   Fax:  212-779-3218

                                                   ***Attorneys for Plaintiff Floors USA Inc.
                                                     and the Class***